STATE of Minnesota, Petitioner,
Appellant,

v.

Franchell Maria ROSSE, Respondent.

No. C5–90–1775.

Supreme Court of Minnesota.

Dec. 20, 1991.

Hubert H. Humphrey, III, Atty. Gen.,
and Tom Foley, Ramsey County Atty., Ste-

ven C. DeCoster, Asst. County Atty., St. Paul, for appellant.

Deborah K. Ellis, Douglas W. Thomson, St. Paul, for respondent.

SIMONETT, Justice.

Defendant was convicted of second and fourth degree violations of the Controlled Substance Law,[1] and sentenced for the presumptive 48 months imprisonment. In an unpublished opinion, the court of appeals reversed and granted a new trial, ruling that the trial court had erred in admitting certain statements without a *Miranda* warning. We affirm the court of appeals.

On November 29, 1989, at about 11 p.m., defendant Franchell Rosse, age 22, gave her friend, Sam Massman, a ride in her car to the apartment of Joseph Garcia. Jim Bonngard rode along in the back seat. Ms. Rosse pulled up in front of Garcia's apartment and sounded the horn. Sam Massman got out of the car, walked to the apartment building entrance, rang the buzzer, and then threw snow at the apartment window. Massman had shortly before informed Garcia by telephone that he was coming over to deliver 200 units ("hits") of LSD.

Unknown to Massman, Ramsey County Deputies shortly before had arrested Joe Garcia in his apartment for selling LSD to an undercover agent, and the deputies were lying in wait for Massman, who was Garcia's dealer.

As soon as Massman was arrested at the apartment building entrance, two unmarked police cars drove up, one stopping in front of Rosse's parked car and the other behind it, thereby effectively blocking Rosse's car in place. Two deputies approached Ms. Rosse with guns drawn. She was ordered out of the car and pat searched for weapons. Bonngard was or-

dered out of the back seat, searched, and (unlike Rosse) handcuffed. Both Bonngard and Rosse were "clean," and the officers put their guns away. One of the officers, Deputy Luey, showed Rosse his badge and identified himself, adding that he needed to search her purse and pockets, and also her car, for suspected LSD. This was done, and Rosse stood by while the car, including the trunk, was searched. No LSD was found.

After the search was over, Rosse, at Deputy Luey's request, sat in the front passenger seat of the officer's Toyota. The officer said nothing as to whether or not Rosse was under arrest, but Deputy Luey testified that he told Rosse she would be free to go "once we figure out exactly what is going on." Although Rosse says she asked to go home in her car, Officer Luey said she never asked. At this point the officers in the apartment building, who by then had Garcia and Massman in custody, told Officer Luey that Rosse might be more involved. Although the officers had searched Massman, he had stuffed the LSD sheets inside his trousers so at this time the LSD had not yet been discovered on him. Officer Luey returned to the Toyota and said to Rosse, "I believe you know more than what you already stated about just driving Sam to drop off some money."

Luey continued to question Rosse but never gave her a *Miranda* warning. It is not clear what questions Luey asked, but finally, according to Luey, Rosse admitted she had driven Massman to Garcia's apartment that afternoon, that she had then driven to an Arby's restaurant with Garcia in the back seat and, while there, Massman had delivered some acid to Garcia. The officer said Rosse told him she was unsure how much acid had been delivered but she thought it was 100 or 200 hits, and that she did not actually see acid exchange hands, only some money. Deputy Luey further testified that Rosse admitted she knew

---

1. Rosse was initially charged with a fourth degree violation, Minn.Stat. § 152.024, subd. 2(2) (1990) (aiding and abetting possession with intent to distribute LSD). After the *Rasmussen* hearing, the State amended the complaint to include a first degree count, Minn.Stat. § 152.-096, subd. 1 (1990) (conspiracy to violate the Controlled Substance Law), and a second degree count, Minn.Stat. § 152.022, subd. 2(3) (1990) (aiding and abetting possession of 100 or more dosage units of LSD). The jury acquitted defendant of the first degree conspiracy count.

Sam wanted her to drive him this second time to deliver more acid.[2]

Rosse and Bonngard were detained about 15 minutes and then released. Later Rosse was arrested and charged. At her trial, over defense objection, Officer Luey was permitted to testify to Rosse's statements made to him.

After the jury found Rosse guilty on the second and fourth degree counts, the trial judge ordered a presentence investigation. Although the probation department recommended that the court depart downward dispositionally and place defendant on probation, the trial judge followed the presumptive guideline and sentenced Rosse to 48 months in prison. Defendant claims the refusal to depart downward dispositionally was an abuse of discretion.

The dispositive issue is whether defendant Rosse was "in custody" when interrogated, so that her statements given without a prior *Miranda* warning should not have been admitted into evidence.

 A *Miranda* warning is required if an individual is in custody when interrogated. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The test is whether a reasonable person in the place of the detainee would believe that he or she was in custody. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). *Miranda* implied that the warning was required whenever a person was "deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 3152. Subsequent decisions have narrowed this language. In *Berkemer* the Court noted that a traffic stop significantly curtails freedom of action, but it nevertheless found that the driver was not in custody, and no *Miranda* warning was needed. 468 U.S. at 436, 441–42, 104 S.Ct. at 3148, 3151. In other words, the fact of restraint is only

a starting point; courts must then examine all of the surrounding facts to determine whether there is a formal arrest or restraints comparable to those associated with a formal arrest. *Berkemer*, 468 U.S. at 441, 104 S.Ct. at 3151; *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam). The current Supreme Court analysis seems to be that a person is "in custody" for purposes of *Miranda* if restrained to a "degree associated with a formal arrest," and if that belief is objectively reasonable.

 The State, using a mixed fourth and fifth amendment analysis, argues that no *Miranda* warning was necessary under the facts of this case. Although the deputies had probable cause to believe a drug delivery was underway, the State contends that it lacked probable cause to arrest Rosse. Certainly, if the officers had arrested Rosse, she would have been entitled to a *Miranda* warning. Instead, the State contends Rosse was being held under a limited investigative detention allowed by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry*, it will be recalled, held that a police officer may hold an individual absent probable cause without violating the fourth amendment so long as the officer can point to specific and articulable facts that reasonably warrant the stop. *Id.* at 21, 88 S.Ct. at 1880. The length of a proper detention depends on the facts and circumstances. *See, e.g., State v. Moffatt*, 450 N.W.2d 116, 119 (Minn.1990). This reasonable suspicion may come from personal observation alone or be combined with information from another source, such as a flyer. *United States v. Hensley*, 469 U.S. 221, 233, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985).

Because Rosse's detention was itself valid under *Terry*, the State reasons that Offi-

---

**2.** At trial, Ms. Rosse took the stand and testified this second conversation with Deputy Luey, at which her incriminatory statements were made, never happened. The jury evidently chose to believe the officer's testimony. Reading the trial transcript, one gets the impression Rosse did not make a particularly believable witness. It was unclear, for example, whether Rosse was

just a casual friend of Sam Massman or whether the relationship was more than that. For example, the telephone in Massman's apartment was in Rosse's name. Rosse testified she never honked the horn when they arrived at Joe Garcia's apartment "because it was too late. I have respect for the neighbors."

cer Luey could properly ask Rosse threshold investigatory questions. In *Berkemer*, the Court noted in dicta that *Terry* stops are not usually subject to *Miranda*. *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150. Because a *Terry* stop is limited in scope, the *Berkemer* Court noted that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.*

Neither, observes the State, is a *Miranda* warning required during questioning following routine traffic stops. In *Berkemer*, the Court held that an officer in a routine traffic stop may ask a moderate number of questions to determine identity and to obtain information confirming or dispelling the officer's suspicions; the detainee is not compelled to respond. 468 U.S. at 439, 104 S.Ct. at 3150. The Court noted in particular two features of a routine traffic stop: (1) the detention is presumptively brief and temporary, and the detainee knows she will likely soon be free to leave; and (2) the detainee does not feel at the mercy of the police because the stop is typically in public, open to scrutiny, and usually involves one, or at most two, police officers. *Id.* at 437–38, 104 S.Ct. at 3148–49. The Minnesota counterpart of *Berkemer* is *State v. Herem*, 384 N.W.2d 880 (Minn.1986). In *Herem*, a police officer placed Herem in the back seat of the squad car after a routine speeding stop and asked him several questions, to which Herem replied with incriminating statements. *Id.* at 881. We held that Herem's detention was not the "functional equivalent of formal arrest" because the questioning was short and only one officer was involved; the fact that Herem was placed in the patrol car did not convert the stop into custody. *Id.* at 883. *See also In re M.A.*, 310 N.W.2d 699, 700 (Minn.1981); *State v. England*, 409 N.W.2d 262, 265–66 (Minn.App.1987).

Respondent Rosse relies heavily on a court of appeals decision, *State v. Seekon*, 392 N.W.2d 624 (Minn.App.1986), *review denied*, (Minn. Oct. 17, 1986). In *Seekon*, two officers responded to a radio report about a motorist who had waved a gun at another motorist. After stopping defendant's truck, the driver and his passenger were frisked for weapons and separated, each being put in a different squad car. *Id.* at 625. The officers asked Seekon identification questions and then explained they were investigating a serious charge. *Id.* at 627. The panel majority held that this was not a routine traffic stop, but rather "a felony stop," and that a *Miranda* warning should have been given. *Id.* at 626. We agree with the State that the *Seekon* reasoning is flawed.

In *Seekon* the court of appeals drew a line between felony and misdemeanor roadside stops, saying felony stops are not routine. *Id.* Although the distinction is relevant for determining if a stop is routine, it does not answer the question in this case. The problem with *Seekon* is that it can be read to require a *Miranda* warning for questioning during all felony stops, which is not true. As the *Seekon* dissent pointed out, "The issue is whether this investigative stop elevated to the functional equivalent of a formal arrest." *Id.* at 628. Indeed, as the dissent points out, *Seekon* seems indistinguishable from *Herem*. *Id.*

Respondent Rosse points out that she was not involved in a routine traffic stop. The State agrees, as do we. But the fact that this stop does not fit the *Berkemer* routine traffic stop does not necessarily mean that a *Miranda* warning was required. The State argues that this court must then analyze whether the interrogation was valid as threshold investigative questioning during a *Terry* stop, pursuant to the *Berkemer* dicta. Respondent Rosse concedes some general on-the-scene questioning may be acceptable under *Terry*, but that all questioning under the *Terry* umbrella is not presumptively admissible; rather, questioning may ripen into custodial interrogation in which a *Miranda* warning is needed.

At issue, then, is the limit on questioning under a fourth amendment *Terry* stop. *Terry* itself did not address the fifth amendment issue, but *Terry* stops are by definition limited in scope. In *State v. Mof-*

*fatt*, 450 N.W.2d 116 (Minn.1990), our court was concerned only with whether defendant's detention amounted to a fourth amendment seizure and we held it did not; the issue of questioning did not arise. Some questioning, however, is allowed. In *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975), the Court noted that "the stop and *inquiry* must be 'reasonably related in scope to the justification for their initiation'" (emphasis added) (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884). In *Berkemer* itself, the Court seemed to envision relatively brief, nonthreatening stops that were not "police dominated." 468 U.S. at 439, 104 S.Ct. at 3150. In fact, *Berkemer* analogized the usual traffic stop to a *Terry* stop. *Id.*

Thus the real issue remains whether the detainee was subject to restraints equivalent to a formal arrest. The labels of "routine traffic stop" and "threshold investigative questioning" seem only to blur this issue. Instructive, we think, is that in *Berkemer*, while holding that routine traffic stops normally would not be custodial, the Court went on to examine the facts to determine if any facts suggested that the defendant was nevertheless "in custody" during the traffic stop. 468 U.S. at 441, 104 S.Ct. at 3151.

Here defendant found herself in the middle of a drug bust. Two unmarked police cars moved in quickly, one to the front and the other to the rear of her car, so that she could not move the car. Besides Officer Luey, there were at least six other police officers on the scene. Rosse's initial contact with the police was at the point of a gun. Although Rosse was not handcuffed, she saw Massman and Bonngard, her two companions, in handcuffs, and she was separated from them. Rosse was pat searched. Police officers then searched her purse, her pockets, and the interior of her car. She was told she would be free to go, but only after everything had been sorted out. During her questioning, she was alone with one officer in his car, but with other police officers close by.

None of these circumstances taken separately creates custody, and some of the circumstances—the relatively short duration of the detention and the fact defendant was then allowed to leave—might suggest a noncustodial situation. However, taken as a whole, we conclude the facts and circumstances of this case were such that a reasonable person would believe that she was in custody and was being restrained to a degree associated with a formal arrest. Consequently, defendant should have been given a *Miranda* warning.

■ Did the erroneous admission of defendant's inculpatory statements, beyond a reasonable doubt, contribute to the guilty verdict? *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988). The State argues the statements, if error, were harmless beyond a reasonable doubt. The State contends that a jury would have convicted Rosse based on Joseph Garcia's testimony that Rosse was present in the car earlier in the day when the first drug transaction between Garcia and Massman took place. Still, Garcia, as a confessed drug dealer, was not a particularly credible witness. The caretaker of Massman's apartment testified that Rosse and Massman were dating each other, but this is somewhat undercut by the fact the witness had been caretaker of the apartment for only 2 days before this incident. Finally, Rosse argues that had her statements to Luey not been admitted, she may not have testified because of the possibility of impeachment.

The strongest evidence of Rosse's guilt was her admissions to Officer Luey that she knew Massman and Garcia were completing a drug deal when they were at Arby's restaurant that afternoon; that she thought the transaction involved between 100 and 200 hits; and that she knew Sam Massman wanted her to drive this second time to deliver more acid. We find harmful error.

We affirm the reversal and grant a new trial. Consequently, we need not reach the sentencing issue.

Affirmed.