STATE of Minnesota, Appellant,

v.

Verne Jack Edward CHAMPION,
Respondent.

No. CX–94–324.

Court of Appeals of Minnesota.

June 14, 1994.

Review Granted Aug. 29, 1994.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for appellant.

Michael Colich, Colich & Associates, Minneapolis, and Peter Cahill, Cahill Law Offices, Wayzata, for respondent.

Considered and decided by PARKER, P.J., and PETERSON and SCHULTZ,* JJ.

## OPINION

PARKER, Judge.

This is a pretrial appeal and cross appeal on the admissibility of defendant's statements. After making inculpatory statements to the police, Verne Champion was placed under arrest, was read his *Miranda* rights, and purportedly waived those rights. Champion then signed a transcribed confession. After a *Rasmussen* hearing, the district court suppressed some of Champion's statements and suppressed his signed confession. The state appeals from the district court's order suppressing some of Champion's statements and his signed confession. Champion cross-appeals from the district court's failure to suppress other statements. We affirm.

## FACTS

On October 25, 1992, Howard Liebhaber was brutally murdered in his apartment. Liebhaber died of asphyxiation consistent with manual strangulation; he also had lacerations on his body. Police observed him lying on the floor of his apartment, his hands tied behind his back and a gag in his mouth.

A witness told police that two men spoke to Liebhaber outside a bar in Minneapolis before his murder. The witness assisted police in making a composite drawing of one of the men and stated that the other man was wearing a green overcoat. The police circulated the composite drawing and other information. An anonymous informant told the police that they should talk to Champion because he might have information on the murder.

Sergeant Steven Berg spoke with police officer Patricia Hellen, who worked at the Y'all Come Back Saloon. Hellen stated that a man meeting the description of one of the men in the flyer had not been in the bar much recently, but had previously been a regular customer. Hellen stated that the man had changed his hair color sometime after Liebhaber's murder and that when she asked the man about the green overcoat she had seen him wearing, he denied owning such a coat. Berg asked Hellen to try to identify that man, and she later identified him as Champion.

On November 30, 1992, at 2:00 p.m., police went to Champion's place of work and told him they would like to speak with him. Champion said he would call later. When Champion called, Sergeant Berg told him the police were investigating Liebhaber's murder and had information that he might have spoken to Liebhaber outside the bar before he was murdered. Berg asked if he and his partner, Sergeant Richard Edinger, could talk to him. Champion asked them to come at 6:30 p.m. when he got off work.

Berg and Edinger went to Champion's workplace at 6:30 p.m. and talked to him for approximately 15 minutes. Champion said that he felt uncomfortable talking at his work place. Berg offered to talk in the squad car or at the police station. Champion responded that talking at the police station would be fine.

During the interview at the police station, Champion stated that he knew Liebhaber and had spoken to him outside the bar before he was murdered. Champion also stated

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

that he had been to Liebhaber's apartment on only one occasion, in 1988 or 1989. At Berg's request, Champion drew a sketch of the floor plan of the apartment as he remembered it. The sketch was of a large efficiency. At some point during the interview, Berg told Champion that he was not under arrest and was free to go. The police arranged a ride home for him at the end of the interview.

After the interview, the police determined that, before 1991, Liebhaber's apartment was a two-bedroom apartment but that, after 1991, the apartment was converted to a large efficiency. The police decided to speak with Champion again because of the floor plan discrepancy, Champion's change of appearance, and his denial that he owned a green overcoat.

On December 7, 1993, Sergeants Berg and Edinger again went to the Y'all Come Back Saloon. Berg asked Champion to get his cousin. Berg and Edinger then took Champion's cousin to the police station for questioning. Berg returned to the bar at 12:35 a.m. Officer Hellen told Berg that Champion had left five minutes earlier to catch the last bus home. Berg drove down Hennepin Avenue looking for him. Berg saw Champion in the back of a bus a few blocks away from the bar and pulled his squad car perpendicular to the sidewalk in front of the bus.

The parties disagree on what occurred on the bus. Berg testified at the *Rasmussen* hearing that he pulled in front of the bus while it was stopped at the corner. He boarded the bus and walked down the aisle toward Champion. Berg testified that, without either of them speaking a word, Champion left the bus by its back door, walked to the squad car and asked, "front seat or back?" Berg said front, and Champion opened the front door and got in.

Champion testified that Berg pulled in front of the bus as it started to pull away from the corner, boarded the bus and, as he walked down the aisle,

[h]e pointed to me. I thought I heard him mumble something like, 'Let's go.' I then got up, exited the back door, went over to the car with Sergeant Berg, asked him, 'Front seat or back?'

According to Champion, Berg opened the front door and closed it after Champion got in. The parties do not dispute, however, that Champion did sit in the front seat, was not pat-searched, and was not placed in handcuffs.

Once in the squad car, Berg said he would like to speak with Champion at the police station. Champion said he was concerned about getting home because the last bus to his home had left, but after Berg told him a ride home would be provided, he agreed to go to the police station. When they arrived at the police station, Berg took Champion to an interview room and left him there with the door closed for approximately ten minutes while he spoke with his partner, Edinger.

The interview, which was not recorded, began at approximately 1:30 a.m. Only Berg and Champion were in the room; the door was closed. Berg testified he told Champion that he was not under arrest and that he was free to leave. Champion denies he was so advised.[1] Berg testified that early in the interview he told Champion he did not believe Champion was telling the truth. According to Champion, Berg told him he knew he committed the murder and that if he confessed the police would go easier on him. During the interview, Berg had Champion write out several of his statements and sign them.

Approximately ten minutes after the interview began, Champion was allowed to leave the interview room to get a drink of water from a water fountain near the waiting room. At the water fountain, Champion would have been in the sight of Sergeant Edinger and a stenographer, who were sitting outside the interview room. Champion took another

---

1. On this issue the district court found:

Sgt. Berg testified at the *Rasmussen* hearing that he specifically advised Champion that he could leave if he wanted to. Champion testified that he was not so advised and that it was his subjective belief he was under arrest. The Court is unable to determine whether or not Champion was so advised; although Sgt. Berg is certainly the more credible witness, both parties have a great deal at stake.

break at approximately 2:15 a.m. to get some water (35 minutes after the last break). At approximately 2:35 a.m. Champion took a break to smoke a cigarette and go to the bathroom.

Soon after he returned from this last break, Champion admitted he and a juvenile went to Liebhaber's apartment to "roll" Liebhaber. Berg testified he understood this to mean that Champion and the juvenile intended to rob Liebhaber. Champion put his face in his hands and began to sob. Berg then asked what happened and, according to Berg, Champion responded, "I put my hands around his neck to try to suffocate him to unconsciousness." During the following hour and 45 minutes, Champion related specific details of the events leading ultimately to Champion suffocating Liebhaber. Champion did not take a break during this period.

Just before 4:15 a.m., Sergeant Berg informed Champion that he was under arrest. Berg then allowed Champion to take another break without escort. Berg then asked Champion if he would make a recorded statement, and Champion agreed. Berg read Champion his *Miranda* rights for the first time at 4:15 a.m. The stenographer, who had been sitting with Sergeant Edinger during the interview, was called into the room and made a transcript of Champion's statement. Champion repeated what he had previously told Berg.

After the *Rasmussen* hearing, the district court held that Champion was not in custody when Berg picked him up from the bus, drove him downtown, and assured him of a ride home. Because the interview was non-custodial, a *Miranda* warning was not required. Accordingly, the district court held that Champion's statements that he went to "roll" Liebhaber and that he put his hands around his throat to suffocate him to unconsciousness were voluntary and admissible.

The district court held, however, that after Champion admitted suffocating Liebhaber, the interview became custodial. The district court concluded that the state had not shown that Champion's statements were voluntary and therefore suppressed Champion's statements after the initial admissions. Finally, the district court held that the state had

failed to show that Champion's waiver of his *Miranda* rights was voluntary. The district court therefore suppressed Champion's signed confession.

The state now appeals the district court's suppression of Champion's later admissions and signed confession. Champion cross-appeals the district court's failure to suppress the initial admissions. We address them chronologically.

## ISSUES

I. Did the district court clearly err by finding that Champion was not in custody after the police officer picked him up from the bus and drove him downtown?

II. Did the district court clearly err by finding that Champion was not in custody after he admitted going to the victim's apartment intending to rob him?

III. Did the district court clearly err by finding that Champion was in custody after he admitted placing his hands around the victim's throat to suffocate him into unconsciousness?

IV. Did the district court clearly err by concluding that Champion's admission of suffocating the victim was voluntary?

V. Did the district court clearly err by concluding that Champion did not voluntarily waive his *Miranda* rights?

## DISCUSSION

### I

■■■ Champion challenges the district court's finding that he was not in custody when Sergeant Berg picked him up from the bus. The state may not use statements stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). A *Miranda* warning is required if the accused is in custody when interrogated. *Id.* at 444, 86 S.Ct. at 1612. There is no dispute that Champion was interrogated; the only issue is whether Champion was in custody.

■ This court will affirm the district court's determination of custodial status unless the district court clearly erred in making its determination. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). The courts must examine the totality of the circumstances to determine whether there was a formal arrest or restraints comparable to those associated with a formal arrest. *State v. Rosse,* 478 N.W.2d 482, 484 (Minn.1991). The test for determining whether the accused is in custody is whether a reasonable person in the place of the accused would believe that he or she was in custody. *Id.*

■ The district court held that, although Champion could reasonably believe he was in custody as Berg approached him on the bus, Berg dissipated this reasonable belief by telling him he would get a ride home after they talked. Furthermore, Berg allowed Champion to ride in the front seat and did not pat-search him or place him in handcuffs.

Champion argues that, under *Rosse,* he was in custody when Sergeant Berg picked him up from the bus. In *Rosse,* the supreme court held that the accused was in custody, and *Miranda* warnings were necessary. *Rosse,* 478 N.W.2d at 486. *Rosse,* however, is distinguishable. There, the accused drove a friend to an apartment where he was to deliver LSD. Two undercover police squad cars blocked Rosse's car to the front and rear. The officers approached Rosse with guns drawn, took her from her car, searched her for weapons, placed her in the front seat of a squad car, and said she was free to go "once we figure out exactly what is going on." *Id.* at 483. In *Rosse* the restrictions placed on the accused were significant and overt.

Unlike Rosse, Champion was not searched, Berg did not draw his weapon, and the officer allowed him to ride in the front seat of the squad car without handcuffs. Although it seems odd that, without either man saying a word, Champion would get up from his seat, exit the bus, go to the squad car, and ask whether he should sit in the front or back, the district court's finding of this as fact is not clearly erroneous. Sergeant Berg's testimony directly supports the district court's finding, and Champion's con-trary testimony is equivocal. Berg's other actions were sufficient to dissipate a reasonable belief that Champion was in custody. Accordingly, we affirm the district court's finding that Champion was not in custody after Sergeant Berg picked him up from the bus and drove him downtown.

## II

■ Champion next argues that the interview at the police station became custodial when he admitted that he and a juvenile went to Liebhaber's home to "roll" him. Factors to consider in determining whether the detainee is in custody during an interrogation include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990).

■ Consideration of whether Champion was advised he was free to leave is not applicable here, because the police failed to preserve an adequate record. Sergeant Berg testified he told Champion he was free to leave. Champion disputes this fact. The district court did not find that Berg made this statement. Had the police made a record of the interview, the difficulty of determining the objective circumstances of the interview would be greatly relieved.

Sergeant Berg initiated the contact with Champion, but Champion agreed to go to the police station. Once at the station, Champion left the room several times to get water, to smoke, or to go to the bathroom. Yet,

even after he was told he was under arrest, he was still allowed the same type of break without supervision. This fact tends to show that the police were not concerned that Champion would leave. The record, though, does not indicate that strong-arm tactics were used during the interview.

■■■ Sergeant Berg testified at the *Rasmussen* hearing that he would not have allowed Champion to leave after making the incriminating statements. Berg's unexpressed intent to place him under arrest, however, would not cause the interview to become custodial. *Stansbury v. California,* — U.S. —, —, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994); *State v. Herem,* 384 N.W.2d 880, 883 (Minn.1986). The fact that Champion may have been the focus of the investigation does not determine whether he was in custody. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *Herem,* 384 N.W.2d at 883, 884 n. 2. The relevant inquiry is whether a reasonable person would believe that he or she was in custody. *Rosse,* 478 N.W.2d at 484.

Viewing the totality of the circumstances, we conclude the district court did not clearly err in finding that Champion was not in custody after his admission that he went to Liebhaber's home intending to "roll" him. Champion's statement regarding his intentions would not necessarily cause a reasonable person to believe his or her freedom of action was deprived in a significant way.

### III

■■■ The state appeals from the district court's finding that the interview became custodial when Champion admitted placing his hands around Liebhaber's throat in order to suffocate him into unconsciousness. This court will reverse a pretrial order suppressing evidence if the state can demonstrate clearly and unequivocally that the district court erred and that the error will have a critical impact on the outcome of the trial. *State v. Joon Kyu Kim,* 398 N.W.2d 544, 547 (Minn.1987). The critical impact prong is not disputed.

The state argues that the interview was not custodial because no one informed Champion he was under arrest, restrained his freedom of movement or jumped up and locked the door, and no additional officers were called to the room. This argument elevates form over substance and would allow police license to decide when one is in custody. While the presence of these factors would show custody, their absence does not necessarily show the interrogation in this case was not custodial. The relevant inquiry for determining whether Champion was in custody is still whether, considering the totality of the circumstances, a reasonable person in his place would believe that he or she was in custody. *Rosse,* 478 N.W.2d at 484.

In an abstract sense, it is possible to accept the premise that one could admit to a serious crime and still not feel one's liberty to be impaired in any significant way, so long as the objective actions of the officer had not changed. Realistically, however, such an admission is a verbal act taking on considerable objective significance. A reasonable person could not feel free to leave an interrogation in a murder investigation after admitting to police that he suffocated the murder victim.

Berg's testimony during the *Rasmussen* hearing that the situation was not custodial because "[i]t never came up" appears to imply that the only reason Champion was not "in custody," in Berg's opinion, was because Champion did not attempt to leave. This statement misses the point, however, because no reasonable person in Champion's position would feel free to leave. Further, Berg testified that if Champion had tried to leave, he would not have been allowed to do so.

The mere subjective intent of the officer does not cause detention to ripen into custody. *Stansbury,* — U.S. at —, —, 114 S.Ct. at 1526, 1529; *Herem,* 384 N.W.2d at 883. Therefore, Berg's unexpressed intent to place Champion under arrest would not cause the interview to ripen into custody. Viewing the totality of the circumstances, however, we conclude the district court did not err in concluding that the interview became custodial after Champion admitted having suffocated Liebhaber.

Sergeant Berg initiated the contact with Champion. While Champion left the interview room three times to get water, to

smoke, or to go to the bathroom, Sergeant Edinger and the stenographer were able to view Champion the entire time. It is far from clear that these breaks show Champion's movement was not restricted in any significant way. After Champion was told he was under arrest, he was again allowed to take a break as before without direct supervision. The police were apparently not concerned with the possibility of Champion attempting to leave. Bearing in mind that he was in the police station, it was approximately 4:15 a.m., and he was without personal transportation, this lack of concern is not remarkable.

Sergeant Berg testified he told Champion during the interrogation that he was free to leave. Whether Berg did so is unresolved. According to Champion, Berg stated during the interview that the police knew he had committed the murder. It is extremely difficult to determine whether a reasonable person in Champion's position would feel free to leave, due to the lack of an adequate record.

The lack of an adequate record is attributable to the police failure to record the interview. As police and prosecutors are aware, the Minnesota Supreme Court has stated that in order for there to be meaningful judicial review of police actions, the police must record these intense interviews in their entirety. *See State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991); *State v. Robinson*, 427 N.W.2d 217, 224 n. 5 (Minn.1988).

Champion did not take a break for an hour and 45 minutes after the admissions. Before the admissions his breaks were spaced from 10 to 35 minutes apart. This change in the objective circumstances of the interview also supports the district court's finding that Champion was in custody.

When Champion admitted to having suffocated Liebhaber, he was aware that the police had reason to believe he had previously lied to them and that his floor plan drawing was in fact inconsistent with the import of his earlier statements. Unlike his preceding statement regarding his intent to rob the victim, Champion had now admitted to suffocating Liebhaber, which was the cause of death. A reasonable person would believe this statement to be sufficient evidence to

inculpate. Champion's admission that he suffocated Liebhaber is itself an objective change in the circumstances of the interview that supports the district court's finding that the interview had become custodial. Finally, the fact that Champion was placed under arrest at the conclusion of the questioning is an objective fact tending to support the district court. *See Griffin*, 922 F.2d at 1355.

The fact that Champion made a highly incriminating admission, viewed in light of the totality of the circumstances, conclusively supports the district court's finding that Champion was in custody. Because no *Miranda* warning had yet been given, we affirm the district court's suppression of Champion's statements made after his admission that he placed his hands around Liebhaber's throat to suffocate him to unconsciousness.

## IV

■ Champion challenges the district court's conclusion that he voluntarily admitted suffocating Liebhaber. In deciding whether a confession was involuntary and should be suppressed, the district court makes findings of fact. This court will then determine, on the basis of all factual findings that are not clearly erroneous, whether the confession was knowing, intelligent, and voluntary. *State v. Buchanan*, 431 N.W.2d 542, 551–52 (Minn.1988); *State v. Hardimon*, 310 N.W.2d 564, 567 (Minn.1981).

■ Voluntariness must be shown by a preponderance of the evidence. *Pilcher*, 472 N.W.2d at 333. Whether a confession is voluntary is judged under the totality of the circumstances. *State v. Andrews*, 388 N.W.2d 723, 730 (Minn.1986). The factors this court considers in determining the voluntariness of a confession include the accused's age, maturity, intelligence, education, experience, ability to comprehend, the lack of or adequacy of warnings, the length of detention, the nature of the interrogation, and any limits on access to counsel and friends. *State v. Patricelli*, 357 N.W.2d 89, 92 (Minn.1984).

At the time of the interview, Champion was 19 years old. The record indicates that he is of average intelligence. His only other experience with the justice system was one

prior interview by the police. The interview took place during the late night and early morning hours after Champion had been at a bar, but there is no indication in the record that his physical or mental condition was impaired. Sergeant Berg did not offer Champion an opportunity to seek advice of counsel or family.

Champion broke down sobbing after admitting he went to Liebhaber's apartment to "roll" him, and Sergeant Berg asked what happened next. An emotionally distressed suspect should be allowed to compose himself before making a confession. *Pilcher,* 472 N.W.2d at 334; *Andrews,* 388 N.W.2d at 730. This factor is not dispositive, however, because the events unfolded rapidly, and Berg's action in asking what happened next did not clearly overbear Champion's will.

Viewing the totality of the circumstances, we affirm the district court's conclusion that the police conduct was not coercive when Champion voluntarily admitted he suffocated Liebhaber.

## V

██ The state challenges the district court's conclusion that Champion's waiver of his *Miranda* rights was involuntary. This court will reverse a pretrial order suppressing evidence if the state can demonstrate clearly and unequivocally that the district court erred and that the error will have a critical impact on the outcome of the trial. *Joon Kyu Kim,* 398 N.W.2d at 547. Again, the critical impact prong is not disputed.

The district court held that the state had not shown by a preponderance of the evidence that Champion had voluntarily waived his *Miranda* rights. The court pointed out that: Sergeant Berg obtained Champion's waiver *prior* to reading Champion the *Miranda* warning; Champion was emotionally distressed after admitting he suffocated Liebhaber; and an hour and 45 minutes of interrogation preceded the *Miranda* warnings. Further, the district court noted its concern over the failure of the police to record the interview.

The state argues that the psychological impact of the prior admissions has no bearing on the voluntariness of Champion's later waiver, citing *Oregon v. Elstad,* 470 U.S. 298, 312, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222 (1985) (psychological impact of a voluntary disclosure does not qualify as state coercion). The Minnesota Supreme Court recently adopted the *Elstad* reasoning in *State v. Moorman,* 505 N.W.2d 593, 599 (Minn.1993).

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

\*     \*     \*     \*     \*     \*

Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the *second statement* was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.

*Moorman,* 505 N.W.2d at 599–600 (emphasis in original) (quoting *Elstad,* 470 U.S. at 309, 318, 105 S.Ct. at 1293, 1297–98). *Elstad* and *Moorman* do not compel a different result in this case. Indeed, the district court correctly applied the totality of the circumstances test. The basis for the district court's holding was not that Champion's signed confession was somehow fruit of the poisonous tree, or that it was tainted under a "cat-out-of-the-bag" theory. The district court explicitly addressed the entire course of police conduct and concluded, as do we, that Champion's waiver was not voluntary.

Champion's admissions that he went to Liebhaber's house to "roll" him and then

suffocated him came two hours after being picked up from the bus and an hour after the interview began. Champion was not read his *Miranda* rights until he had discussed the incident for an additional hour and 45 minutes after his initial inculpatory statements. Berg had Champion sign several statements during the interview, and the district court noted that Champion's answers had become "so concrete that he would be unlikely to feel he could retract them or retreat." Champion is young and inexperienced with the criminal justice system. The interview took place in the early morning hours, and Champion had been at a bar, although the district court stated that the record lacked evidence that his physical or mental condition was impaired.

The strongest factor requiring the conclusion that the waiver was involuntary is the fact that Sergeant Berg got Champion to agree to make out a written statement before reading Champion the *Miranda* warning. The district court was particularly disturbed that Champion essentially waived his right to silence before being read the *Miranda* warning. We agree, because it appears Champion was induced to waive his rights before being told for the first time what his rights were.

Further, the police made it impossible for the courts to review the actual interview in order to determine whether coercion was used. Champion testified that Sergeant Berg made threats and promises during the interview. If true, these factors would support a finding that the subsequent confession was coerced. *See State v. Jensen,* 349 N.W.2d 317, 321 (Minn.App.1984) (confession occurring after involuntary confession subject to derivative evidence rule). In *Pilcher,* the supreme court stated:

In *Robinson,* this court observed that disputes over an accused's claims of denial of constitutional rights would be eliminated if police interrogators would electronically record, not just the commencement of the actual interrogation, but the entire conversation with an accused relative to the accused's constitutional rights. The present case provides a stellar example of a dispute that could have been avoided had the law enforcement officers followed our rec-

ommendation in *Robinson.* In the future, we urge that law enforcement professionals use those technological means at their disposal to fully preserve those conversations and events preceding the actual interrogation. *Law enforcement personnel and prosecutors may expect that this court will look with great disfavor upon any further refusal to heed these admonitions.*

*Pilcher,* 472 N.W.2d at 333 (citations omitted) (emphasis added); *see also Robinson,* 427 N.W.2d at 224 n. 5 ("disputes arising from an accused's claim of denial of constitutional rights could be obviated if police interrogators would record all conversations with the accused relative to the accused's constitutional rights"). Sergeant Berg failed to record any part of the interrogation aside from the final statement given before the stenographer.

Although the failure to record the interview is not a factor tending to show the waiver was involuntary, the failure to preserve an adequate record makes a review of the objective circumstances of the interview extremely difficult. It is entirely possible that, had the police recorded the entire interview, the record would have provided sufficient objective evidence to show that Champion's will was not overborne.

In the absence of such a record, however, we conclude that, viewing the totality of the circumstances preserved in the record, we must affirm the district court's conclusion that Champion's waiver of his *Miranda* rights was not voluntary. Because Champion agreed to sign a confession before being read the *Miranda* warnings, and because his acquiescence came after an emotional breakdown and incriminating admissions, we agree with the trial court that his will was overborne and his waiver involuntary.

## DECISION

The record supports the district court's findings. The district court properly admitted Champion's statements prior to and including his admission that he suffocated the victim, because these statements were voluntary statements made during non-custodial

interrogation. The district court properly suppressed Champion's subsequent statements, including his signed confession made after his admission that he suffocated the victim because those statements were made during custodial interrogation without *Miranda* warnings. Champion agreed to sign the confession before being given the *Miranda* warnings; thus, his waiver was involuntary.

**Affirmed.**