**STATE of Minnesota, Petitioner, Appellant,**

v.

**Verne Jack Edward CHAMPION, Respondent.**

No. CX–94–324.

Supreme Court of Minnesota.

June 16, 1995.

## OPINION

TOMLJANOVICH, Justice.

In its decision in this case, the court of appeals affirmed a pretrial order of the district court suppressing evidence in the prosecution of defendant, Verne Jack Edward Champion, for first-degree murder and attempted aggravated robbery. *State v. Champion,* 517 N.W.2d 350 (Minn.App.1994). At issue is the admission of certain statements defendant made to the police at various times during the course of the police investigation. During what was initially a noncustodial, consensual encounter, defendant made a highly incriminating statement. The trial court held that subsequent questioning was custodial in nature and that the police therefore should have given defendant a *Miranda* warning before continuing to question him. The trial court suppressed the oral unrecorded statements made in response to further interrogation. It also suppressed a subsequent post-*Miranda* transcribed confession on the ground that the confession was involuntary. The court of appeals affirmed the trial court's suppression order. We affirm the suppression of the oral unrecorded statements made by defendant after the point at which the trial court determined that defendant was in custody, but we reverse the suppression of the transcribed statements made following the giving of the *Miranda* warning.

On October 25, 1992, Howard Liebhaber was found dead in his condominium at 25th and Lyndale Avenue South in Minneapolis. His hands were bound behind his back and there was a gag in his mouth. An autopsy revealed that he died of asphyxiation caused by manual strangulation.

Police investigators learned that the victim had been talking with two young men outside the Gay Nineties Bar early on October 25, 1992. An anonymous informant told police that defendant might have information about the murder, and a bouncer at the Gay Nineties told police that someone had seen defen-

Hubert H. Humphrey, III, Atty. Gen., St. Paul and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for appellant.

Michael J. Colich, Claudia J. Engeland, Colich & Associates, Minneapolis, for respondent.

dant talking with the victim inside the Gay Nineties on the night in question.

Police officer Patricia Hellen, who worked off-duty at the Y'all Come Back Saloon (Saloon), told investigating officers that a regular at the Saloon, later identified as defendant, fit the composite drawing of one of the two men with whom the victim was last seen. On November 29, 1992, over a month after the killing, Officer Hellen saw defendant at the Saloon. She noticed that his hair was parted differently and had been dyed. She informed Sergeants Steven Berg and Richard Edinger, who had been assigned to the case, of her observations and asked defendant to call Sergeant Berg.

On November 30, 1992, after receiving a call from defendant, Sergeants Berg and Edinger went to the McDonald's where defendant worked. When the officers told defendant they wanted to talk with him about the victim's murder, defendant requested that they talk with him elsewhere. Sergeant Berg asked defendant if he would prefer to go downtown to the homicide office, and defendant agreed.

At the homicide office, defendant admitted knowing the victim and admitted having talked with him outside the Gay Nineties after closing on October 25, 1992. He said that he had introduced the victim to another person, whom he did not know. He said that he had been at the victim's condominium for a party on Groundhog Day in 1989, but had not been there since then. At Officer Berg's request, defendant drew the floor plan of the victim's condominium as he remembered it; defendant drew a floor plan of an efficiency. After defendant left, police obtained the floor plan of the condominium in 1989 and determined that while the floor plan in 1992 was as depicted by defendant, it was not that way in 1989 when defendant said he had last been there.

Late on January 7, 1993, Sergeants Berg and Edinger went to the Saloon, encountered defendant and told him they wanted to talk with his cousin, who was also at the Saloon. After dropping off Sergeant Edinger and defendant's cousin at the homicide office, Sergeant Berg returned to the Saloon and learned that defendant had left to catch a bus.

Upon spotting defendant sitting alone in the back of a bus at a bus stop, Sergeant Berg drove in front of the bus, got out of his car, and entered the front of the bus. Defendant immediately got up, left the bus via the back door, walked up to Sergeant Berg's car, and, as Sergeant Berg exited the bus, said "Front or back seat?" Sergeant Berg opened the front door and said "Front seat." Officer Berg did not search or handcuff defendant. After defendant was in the car, Sergeant Berg asked him if it would be okay if they went to the office. Defendant expressed concern about getting home, since that bus was the last one of the day, and Berg told him that he would "make sure" that he got home.

Sergeant Berg testified that upon arriving at the police station he seated defendant in an interview room, closed the door, and told defendant that he was still investigating the victim's death. The interview began at approximately 1:30 a.m. At approximately 2:30 a.m. defendant took a cigarette and bathroom break. Previously defendant had twice taken breaks to get a drink of water from a fountain in a hall outside the interview room. On each of these three breaks defendant left the interview room unescorted. After defendant returned to the interview room following the cigarette and bathroom break, he admitted the victim had invited his friend Brett and he to the victim's condominium the night of the killing, and that they had accepted intending to "roll" the victim. Defendant then began sobbing. Sergeant Berg asked what happened, to which defendant responded, "I put my hands around his neck and tried to suffocate him into unconsciousness."

After questioning defendant for approximately 90 more minutes, at 4 a.m. Sergeant Berg finally told defendant that he was under arrest. After informing defendant he was under arrest, Sergeant Berg let defendant leave the interview room unescorted to go to the bathroom and to smoke a cigarette. After defendant returned, he agreed to give a written statement. Sergeant Berg then gave defendant a *Miranda* warning and obtained a waiver of his right to remain silent.

Defendant then gave a 7–page written confession repeating the unrecorded admissions he had made earlier.

The trial court ruled that the interrogation on January 8 was not the functional equivalent of custodial or post-arrest interrogation at the time the interrogation started, because defendant came to the station voluntarily and voluntarily submitted to questioning, just as he had done on November 30. However, the trial court ruled that once defendant told Sergeant Berg that he had tried to suffocate the victim, defendant would not reasonably feel free to leave. The trial court therefore ruled that defendant's subsequent statements to Sergeant Berg up to the point a *Miranda* warning was given had to be suppressed. The trial court ruled further that the post-*Miranda* statements had to be suppressed, based on the trial court's belief that the waiver of *Miranda* rights was involuntary.

The court of appeals affirmed the trial court's determination that defendant was in custody after he broke down and admitted trying to suffocate the victim. The court of appeals stated, in relevant part, that "[a] reasonable person could not feel free to leave an interrogation in a murder investigation after admitting to police that he suffocated the murder victim." 517 N.W.2d at 356. Stated differently, defendant's admission that he attempted to suffocate the victim was an objective change in the circumstances "conclusively" converting the interrogation from a noncustodial one into a custodial one. *Id.* at 357.

■ While we affirm the trial court's determination that defendant was in custody after he admitted trying to suffocate the victim, we disagree with the court of appeals' analysis. The court of appeals appears to have adopted a "bright line rule." As the court of appeals put it, "[a] reasonable person could not feel free to leave an interrogation in a murder investigation after admitting to police that he suffocated the murder victim." 517 N.W.2d at 356. Case law, however, does not support that rule.

■ We follow the custody test adopted in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The test is whether a reasonable person under the circumstances would believe that he or she was in police custody of the degree associated with formal arrest. *State v. Rosse*, 478 N.W.2d 482, 484 (Minn.1991) (citing *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151). The test is not whether a reasonable person would believe he or she was not free to leave. Moreover, an officer's unarticulated decision not to let the suspect leave at the end of the interrogation has no bearing on the question of whether a suspect was in custody; the only relevant inquiry is how a reasonable person in the suspect's position would have understood the situation. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151. The underlying purpose of *Miranda* was to stop certain coercive practices used by police in custodial interrogation. If a station house interrogation is noncustodial at the outset and police do not change any of the circumstances of the interrogation during the course of the interrogation, they should be free to continue to ask questions after the suspect makes a significant incriminating statement without first stopping and giving the suspect a *Miranda* warning, *provided* that a reasonable person under the circumstances would not believe that he or she was in police custody of the degree associated with formal arrest. *Rosse*, 478 N.W.2d at 484. No "bright line rule" exists.

Here the interrogation was noncustodial at the outset. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *California v. Beheler*, 463 U.S. 1121, 1124–25, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). However, that does not end our inquiry. The ultimate issue for the trial court to decide in this case was whether a reasonable person, having just confessed that he attempted to suffocate the victim, would, under *all* the circumstances, believe he or she was in police custody of the degree associated with formal arrest. *See Rosse*, 478 N.W.2d at 486 (stating that where "[n]one of [the] circumstances taken separately creates custody" and "some of the circumstances * * * might suggest a noncustodial situation[,] * * * [but] taken as a whole, we conclude the facts and circumstances of this case were such that a reasonable person would believe that she was in

custody and was being restrained to a degree associated with a formal arrest.").

■ Here the trial court used the proper legal standard and made a fact-specific determination that the police interrogation of Champion, although not custodial at the outset, became custodial in nature after he admitted choking the victim. We give considerable, but not unlimited, deference to a trial court's fact-specific resolution of such an issue when the proper legal standard is applied. *Minnesota v. Olson,* 495 U.S. 91, 100, 102, 110 S.Ct. 1684, 1690, 1691, 109 L.Ed.2d 85 (1990). In this case, while individual members of this court might well have resolved the dispute differently, we conclude that the trial court did not clearly err in resolving the matter as it did.

■ While we affirm the court of appeals' determination as to whether interrogation of defendant became custodial in nature, we disagree with the court of appeals' analysis which led to its affirmance of the trial court's determination that defendant's transcribed confession, given after he received a *Miranda* warning, was involuntary. The court of appeals' analysis of this issue is inconsistent with decisions of both the United States Supreme Court and of this court that generally a failure to give a required *Miranda* warning does not render involuntary any subsequent statement made after the giving of a *Miranda* warning. *State v. Moorman,* 505 N.W.2d 593, 599–600 (Minn.1993) (citing *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

In *Elstad,* the Court said:

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

470 U.S. at 309, 105 S.Ct. at 1293. The Court continued:

Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.

*Id.* at 318, 105 S.Ct. at 1297 (footnote omitted).

In *State v. Linder,* 268 N.W.2d 734 (Minn. 1978), we listed some of the factors to be considered in a totality-of-the-circumstances inquiry into the voluntariness of a confession. Those factors include:

[A]ge, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, limits on access to counsel and friends, and others.

*Id.* at 735.

Looking at all the relevant factors in this case, we conclude that the trial court clearly erred in determining that defendant's transcribed confession was involuntary.

Affirmed in part, reversed in part, remanded for trial.