STATE of Minnesota, Respondent,

v.

Mark Owen STAATS, Appellant.

No. C8–02–174.

Supreme Court of Minnesota.

March 27, 2003.

Rehearing Denied April 28, 2003.

Richard Sand, Daniel S. Adkins, Richard Sand & Associates, PA, St. Paul, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Michael Richardson, Asst. County Attorney, Minneapolis, MN, for Respondent.

## OPINION

MEYER, Justice.

A jury convicted Mark Owen Staats of the crime of aiding and abetting the first-degree murder of Dustin Jirasek. Staats was sentenced to life in prison. In this direct appeal, Staats contends that the district court erred in admitting into evidence each of the five statements he gave to police, the court's error was not harmless, and consequently his conviction should be reversed. We are asked to determine whether police obtained the first two statements in violation of the recording requirement of *State v. Scales*, 518 N.W.2d 587 (Minn.1994), and, if so, whether statements

and evidence subsequently obtained should be suppressed under a "fruit of the poisonous tree" analysis. We also consider whether one of the statements was obtained in violation of Staats' right to counsel.

Dustin Jirasek was shot and killed at close range while standing in the doorway of his home on December 16, 2000. Minnetonka police immediately suspected Mike Dahlin. When they spoke to Dahlin, he claimed he was with Mark Owen Staats in another location at the time of the murder. Sergeant Cziok and Officer Petersen of the Minnetonka police department drove to Staats' home to investigate Dahlin's alibi.

Cziok and Petersen arrived at Staats' residence around 5 p.m. on December 18, 2000. They introduced themselves and went inside. Petersen began questioning Staats about his relationship with Dahlin and their whereabouts on the night of the killing. Staats said he was at home until 10:50 p.m. on the night in question and then went to two bars with Dahlin before eventually retiring to Dahlin's house. After speaking to Staats for fifteen or twenty minutes, Petersen gave him a *Miranda* warning and took a recorded statement, recapping the information Staats had given her.

Toward the end of this recorded statement, Staats' mother arrived at the home. Cziok asked to speak with her in another room. After Cziok and Petersen noticed discrepancies between Staats' description of the events on the night in question and his mother's description, Petersen asked Staats to give a second recorded statement and Staats agreed. Petersen reminded him of his *Miranda* rights and recorded a second statement, in which Staats admitted that he waited in the truck while Dah-

lin went up to the house of someone who was "harassing" Dahlin's girlfriend. Staats claimed he heard a loud "bang" as he waited in the truck. The officers then arrested Staats and brought him to the police station.

Over the course of the next four days, while in police custody, Staats gave three more recorded statements to police and made an admission in court.[1] His story changed several times as he described his activities on the evening of the murder. Eventually, police discovered that Staats and Dahlin were drinking, and Staats understood that Dahlin wanted to rough up Jirasek. Then Staats accompanied Dahlin to a K–Mart where they allegedly discussed which type of ammunition to purchase, and bought ammunition and stocking caps. Staats contributed change to the purchase when Dahlin came up short of cash. They drove to Jirasek's house, and Staats was present in the doorway when Jirasek was killed. Dahlin and Staats then drove to a wooded area and disposed of the weapon.

The five statements from Staats incriminated himself and Dahlin, and provided police with crucial leads in their investigation. In the suppression hearing, the defense argued that the two interviews at Staats' home were custodial, and because the police did not properly record them under *Scales*, the statements must be suppressed. Staats then introduced the report of an expert who found fifteen points at which the tape was stopped and restarted during the two statements at Staats' home. Staats testified that during those stoppages he had requested an attorney, and that police had coerced him into making incriminating statements. In addition to arguing that these two statements

---

1. In his first appearance before a judge on December 22, 2000, Staats volunteered that he had furnished twelve cents toward Dahlin's purchase of shotgun shells.

should have been excluded under *Scales*, Staats argued that his last statement to police should have been excluded as a violation of his right to counsel.

The district court denied Staats' motion to suppress the five statements after hearing testimony from Staats, his mother, and police officers. The district court acknowledged the seriousness of Staats' contentions, but specifically rejected the testimony of Staats and found it not credible. It found that the first two statements in Staats' home need not comply with the *Scales* recording requirement because Staats was not in custody when he gave them. The district court also concluded that Staats' fifth statement was properly obtained because he reinitiated contact with the police after invoking his right to counsel. Staats did not testify at trial. The state's evidence against him consisted primarily of Staats' five recorded statements.

### I.

We first decide whether Staats was in custody when the police recorded two statements in his home. If he was in custody, the recordings may be suppressed if they do not meet the standards directed by this court in *State v. Scales*, 518 N.W.2d 587 (Minn.1994). If the recordings fail the *Scales* standard, evidence subsequently obtained may also be suppressed under a "fruit of the poisonous tree" analysis. *State v. Warndahl*, 436 N.W.2d 770 (Minn. 1989); *see also Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The district court found that Staats was not in custody when the police recorded the two statements in his home and therefore the statements were not required to be recorded.

 This court makes an independent determination about whether Staats was in custody. *State v. Wiernasz*, 584 N.W.2d 1,

3 (Minn.1998). With respect to the facts, however, we review the district court's findings for clear error. *State v. Hince*, 540 N.W.2d 820, 823 (Minn.1995). We grant "considerable, but not unlimited, deference to a trial court's fact-specific resolution of such an issue when the proper legal standard is applied." *State v. Champion*, 533 N.W.2d 40, 44 (Minn.1995).

 The test for determining whether Staats was in custody is whether

> a reasonable person in the suspect's situation [would] have understood that he was in custody. If a suspect has not yet been arrested, a district court must examine all of the surrounding circumstances and evaluate whether a reasonable person in the suspect's position would have believed he was in custody to the degree associated with arrest.

*State v. Miller*, 573 N.W.2d 661, 670 (Minn.1998) (citations omitted). In reviewing "all of the surrounding circumstances" to determine whether a suspect was in custody, this court has looked to many factors. While no factor alone is determinative, this court has noted that the following factors may combine to indicate custody: police interviewing the suspect at the police station; the officer telling the individual that he or she is the prime suspect; officers restraining the suspect's freedom; the suspect making a significantly incriminating statement; the presence of multiple officers (six); and a gun pointing at the suspect. *See Wiernasz*, 584 N.W.2d at 3–4; *Champion*, 533 N.W.2d at 43; *State v. Rosse*, 478 N.W.2d 482, 486 (Minn.1991). However, regardless of whether the suspect made incriminating comments, this court has said that if an interrogation is noncustodial at the outset and no circumstances change, it remains noncustodial. *Champion*, 533 N.W.2d at 43.

This court has recognized that one or more of the following circumstances may indicate a suspect is not in custody: questioning taking place in the suspect's home; police expressly informing the suspect that he or she is not under arrest; the suspect leaving the police station at the close of the interview without hindrance; the brevity of questioning (fifteen minutes); the suspect's freedom to leave at any time; a nonthreatening environment; and the suspect's ability to make phone calls. *See Wiernasz*, 584 N.W.2d at 3–5; *Hince*, 540 N.W.2d at 824.

The circumstances in this case indicate that Staats was not in custody. The officers did not tell him he was under arrest, questioning took place in his home, and the tapes do not indicate any intimidation or show of force by the police. Several friends of Staats were allowed to continue playing video games in the living room while Staats was interviewed in the kitchen. The phone rang multiple times during both recorded statements, and the police officers did not prevent Staats from answering the phone. Staats moved around the house, borrowing cigarettes from friends and placing a barking dog in a bedroom. Importantly, the district court made a finding that Staats' claim that he was coerced into making incriminating statements was not credible, based on the court's observations of Staats' demeanor on the witness stand at the suppression hearing. The interrogation was noncustodial in the beginning and no circumstances changed, so it remained noncustodial. *Champion*, 533 N.W.2d at 43. Even though the questioning cannot be said to be brief (a total of ninety minutes) and Staats was arrested immediately after the statements were concluded, the overall circumstances surrounding the interviews suggest he was not coerced into talking to the police officers and a reasonable person would not believe he was in custody.

■ Staats argues that the police officer's decision to record his statements is proof that the officer considered Staats to be in custody. Officer Petersen testified at the suppression hearing that she did not consider Staats to be in custody, but gave the *Miranda* warning and recorded the statements in order to be cautious. We observed in *Conger* that recording even noncustodial interrogations would have significant benefits. *State v. Conger*, 652 N.W.2d 704, 709 (Minn.2002). While police are not currently required to record noncustodial interrogations, we want to encourage the practice and a rule that treats recording as indicative of custody would undermine that policy. *See id.* Because the police were not required to record the two statements in Staats' home, we need not reach the question of whether the stoppages on the tapes violated the *Scales* standard, nor do we determine whether subsequent statements must be suppressed as "fruits of the poisonous tree."[2] We hold that Staats was not in custody when the police obtained two recorded statements in his home, and we affirm the district court's admission of those two statements at trial.

## II.

Staats seeks to suppress the last of his five statements to police claiming the

---

2. The disputes in this case over the reasons for the tape stoppages and what transpired while the tape was stopped would have been avoided if the officer had given more information before she stopped the tape and after she restarted it. Noting the reason for the stop and the time of stop before turning off the tape, and then the activity during the break and length of break once the tape is restarted, would avoid these types of accusations. *See State v. Schroeder*, 560 N.W.2d 739, 741 (Minn.App.1997) (noting that it would be prudent for officers to follow these procedures after an unrecorded period).

statement was obtained in violation of his right to counsel. The district court denied suppression of the fifth statement because it found that even though Staats had invoked his right to counsel before the fifth statement, he reinitiated contact with the police and waived this right. We analyze this question in a three-step process. *State v. Munson*, 594 N.W.2d 128, 138–39 (Minn.1999). First, we determine whether Staats invoked his right to counsel before the police attempted to take the statement. *Id.* Second, if he invoked his right to counsel, we examine whether Staats reinitiated conversation with police. *Id.* Third, if he reinitiated conversation with police, we consider whether he properly waived his invoked right to counsel before the police proceeded to take the statement. *Id. See also Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

■ We review a district court's findings regarding whether an accused invoked his or her right to counsel for clear error. *Munson*, 594 N.W.2d at 139. But we conduct an independent review of whether the defendant reinitiated conversation with police or waived his or her invoked right to counsel. *State v. Hannon*, 636 N.W.2d 796, 804–06 (Minn.2001).

■ The right to an attorney is necessary to protect the suspect's right to remain silent. *See Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). Under Minnesota's rule of law, police must stop interrogating an accused even if the accused makes an ambiguous or equivocal statement regarding counsel, so long as the statement is one "that could reasonably be construed as an invocation of the accused's right to counsel, except for narrow questions designed to clarify the accused's true desires regarding counsel." *State v. Risk*, 598 N.W.2d 642, 648–49 (Minn.1999). The district court found that Staats made an unequivocal request for an attorney before giving the fifth statement. On appeal the state argues that the court erred in making that finding.

The facts surrounding Staats' invocation of counsel are essentially undisputed. He was arrested on the evening of December 18, and his 36–hour hold was due to expire at noon on the 20th. *See* Minn. R.Crim. P. 4.02, subd. 5(1). After making his fourth statement to police, Staats told Officer Cziok on December 20 that he was concerned about his 36–hour hold having expired. At the suppression hearing, Cziok testified "[Staats] told me that he wanted to talk to a lawyer." Cziok had the impression that Staats wanted to speak to a lawyer about why he was being held longer and why he had not yet been charged. When Cziok offered Staats a phone book, Staats declined the opportunity to use the phone, suggesting he would use a public defender. Cziok then informed the other investigators that they could not question Staats further unless Staats initiated the contact. The district court found that Staats initially made an equivocal statement regarding his desire for an attorney, but after the officers clarified his request "[t]he defendant's equivocal statement became unequivocal." We review the district court's finding for clear error and conclude that the record amply supports the district court's ultimate determination that Staats made an unequivocal request for counsel. We hold that Staats unequivocally invoked his right to counsel when he asked to speak to a lawyer about his 36–hour hold.

■ We turn to the question of whether Staats, having invoked his right to counsel, reinitiated contact with the police before giving his fifth and final recorded statement. The district court reviewed the circumstances and found that Staats had, in fact, initiated further contact with

the police. As stated above, the question of initiation is a legal determination that receives independent review from this court. *Munson*, 594 N.W.2d at 141. Once an accused invokes a right to counsel, he or she cannot be subjected to further interrogation by police until counsel is provided, unless the accused initiates further communication with the police and then waives the right he or she previously invoked. *Hannon*, 636 N.W.2d at 805. The state has the burden of proving that Staats initiated conversation with the police after telling Cziok that he wanted an attorney. *See Munson*, 594 N.W.2d at 141. This court must apply a totality of the circumstances test to the district court's findings in determining whether the state has met its burden. *Id.*

The United States Supreme Court has held that some questions from accused persons "are so routine that they cannot be fairly said to represent a desire * * * to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (mentioning specifically requests for a drink of water or a phone call). In *Bradshaw*, the accused asked, after invoking his right to counsel: "what is going to happen to me now?" *Id.* at 1045–46, 103 S.Ct. 2830. The Court characterized that as initiating further conversation because it "evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045, 103 S.Ct. 2830.

In this case, soon after Staats asked for an attorney to discuss his 36–hour hold, Sergeant Cayo showed Staats the paper in which the court extended the hold. As Cayo was on his way out of the cell, Staats requested to speak to one of the investigators. Investigator Petersen went to Staats and recorded her conversation with him. She asked what Staats wanted, and he said he wanted to know how long his hold was extended. Petersen informed Staats that his hold was extended for two days and talked to him about getting a shower and a phone call to his mother. The entire conversation lasted a few minutes. The totality of the circumstances does not lead us to conclude that Staats reinitiated substantive conversation about the investigation. He asked about the extension of his 36–hour hold, a shower, and a phone call to his mother. The routine nature of his questions and the fact that the conversation ended after a few minutes do not suggest a desire by Staats to open up a more generalized discussion about the investigation. We conclude that the state did not meet its burden of showing Staats initiated a substantive conversation with police after he invoked his right to counsel.

■■■ Even if the state could prove that Staats initiated contact with the police before giving his final statement, it failed to meet its burden of proving that Staats waived his invoked right to counsel. This court makes an independent determination, based on the district court's findings of fact, "of whether the state has shown by a fair preponderance of the evidence that the suspect's waiver was knowing, intelligent, and voluntary." *Hannon*, 636 N.W.2d at 807. In the instant case, Officers Owens and Holland gave Staats a *Miranda* warning before they recorded the fifth statement, but neither officer discussed with Staats his previously invoked right to counsel. The state must show the suspect affirmatively acknowledges that he or she is revoking a previously invoked right to counsel. *See id. Accord Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (emphasizing that a valid waiver is not established simply by showing that the accused responded to

further police-initiated interrogation). The state cannot rely solely on the *Miranda* warning to establish waiver. Therefore, the state has not met its burden of proving Staats waived his invoked right to counsel. We hold that Staats' constitutional right to counsel was violated when police obtained the fifth statement and the district court erred in admitting the statement into evidence.

## III.

■ We turn now to decide what remedy, if any, should be granted to Staats for the district court's error in allowing into evidence Staats' fifth and final statement. We will not overturn his conviction if "admission of the statement[ ] was harmless beyond a reasonable doubt." *Hannon*, 636 N.W.2d at 807. To meet the standard, the verdict must be "surely unattributable" to the error. *Id.* (quoting *State v. McDonough*, 631 N.W.2d 373, 384 (Minn.2001)).

We carefully examine the contents of Staats' fifth statement to determine whether it contains any incriminating evidence not admitted through his other four statements, and the extent to which the state relied on the fifth statement in its case. In the fifth statement, Staats suggests that he may have contributed twelve cents to the purchase of the shotgun shells, but he does not make a definite admission as such. He mentions talking briefly with Dahlin at K–Mart about the types of ammunition Dahlin should buy, but Staats claims that he thought the shells were for shooting clay pigeons or beer cans the next day. The majority of the statement concerns where Staats and Dahlin went after the shooting and what each was wearing.

The crux of Staats' admissions regarding his involvement in the crime is contained in the second through fourth statements; he went with Dahlin to K–Mart where the ammunition and black stocking caps were purchased; he carried a handgun to the scene of the killing; he stood in the doorway where Dahlin shot Jirasek; after leaving Jirasek's house, they stopped to get rid of the guns; and Dahlin told him to keep quiet about the evening's events. The only new admission in the fifth statement was the suggestion that Staats contributed change to the purchase of the shotgun shells at K–Mart. However, this admission was also made in open court at a pretrial hearing and a transcript of that hearing was received in evidence at the trial. Finally, while the state used the fifth statement to attack Staats' credibility when it went through a litany of inconsistencies in the five statements, most of the inconsistencies were rooted in Staats' earlier statements.

We conclude that because Staats made all of the key admissions in his first four statements, the jury's verdict was surely unattributable to the admission of Staats' fifth statement. We therefore hold that its admission, although error, was harmless beyond a reasonable doubt.

Staats' conviction is affirmed.