STATE of Minnesota, Respondent,

v.

John Russell HEDEN, Appellant.

No. A05–1386.

Supreme Court of Minnesota.

Aug. 10, 2006.

Office of the State Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota State Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, David M. Olin, Pennington County Attorney, Thief River Falls, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

On April 4, 2005, a Pennington County jury found John Russell Heden guilty of first-degree murder—criminal sexual conduct, in violation of Minn.Stat. § 609.185(a)(2) (2004); first-degree murder—child abuse, in violation of Minn.Stat. § 609.185(a)(5) (2004); and second-degree felony murder, in violation of Minn.Stat. § 609.19, subd. 2(1) (2004), for the March 1, 2004 "shaken infant" death of his three-month-old daughter. The district court

then convicted Heden of first-degree murder—criminal sexual conduct and sentenced him to life imprisonment without the possibility of release. Heden raises seven issues on this direct appeal and asks us to reverse and dismiss the charge of first-degree murder—criminal sexual conduct and remand for a new trial on first-degree murder—child abuse and second-degree felony murder. We affirm.

At 6:40 a.m. on March 1, 2004, appellant John Russell Heden dialed 911 to report that his three-month-old daughter, Rose, was not breathing. Emergency responders arrived within minutes, but they were unable to revive Rose, who was not breathing, had no pulse, and had blood coming out of her nose. When a paramedic informed Heden that further resuscitation efforts would be futile, he responded by shrugging his shoulders and making a statement to the effect that, unfortunately, bad things happen. Heden's wife, Shawna, who had been at work, was picked up by first responders and arrived home after the resuscitation efforts were terminated. After securing the scene, a deputy asked Heden and Shawna to go to the county law enforcement center to be interviewed. A first responder gave Heden and Shawna a ride because the Hedens' only working vehicle was still at Shawna's place of employment.

Heden and Shawna waited in the lobby of the law enforcement center for a Bureau of Criminal Apprehension (BCA) agent to interview them. When BCA Agent Philip Hodapp arrived, he introduced himself and explained that he was going to the county attorney's office, but would be back to speak with them. At that time, a deputy was at the county attorney's office preparing a search warrant for the Hedens' home.

Shawna, who was interviewed first, informed Hodapp that she had gotten up around 5:00 a.m. and left for work at approximately 5:15 a.m. Shawna stated that she had last checked on Rose at 1:00 a.m., at which point Rose had been fine. Hodapp interviewed Heden next. This interview, like the interview of Shawna, was recorded. Heden was neither under arrest nor physically restrained during the interview. Heden's stepsister, who was in the lobby of the law enforcement center during the interviews, testified that Heden and Shawna were "free to go in and out" of the building.

During this first interview, Heden initially told Hodapp that he had woken up around 6:00 a.m. to find Rose unresponsive and then called 911. Later in the one-hour interview, Heden said that he had gotten up a little bit earlier to feed Rose, and then found her unresponsive when he checked on her at about 6:00 a.m. Heden denied striking or shaking Rose that morning, but acknowledged that he had shaken her lightly on or about February 14. He also acknowledged having performed "rescue breathing" on Rose about one month earlier. Both Heden and Shawna gave permission to search their home and agreed to provide Hodapp with the clothing they were wearing that morning. Hodapp then suggested that Heden and Shawna meet him at their home so that they could give him their clothing.

Heden and Shawna left the law enforcement center in Heden's stepsister's car. Hodapp arrived at the Hedens' home about 20 to 30 minutes before the Hedens and, while there, he observed blood spatters around Rose's crib. Based on discrepancies between the evidence at the scene and Heden's earlier statement, Hodapp decided to interview Heden again. After Heden and Shawna arrived, they were admitted to the home one at a time to change their clothes. When it was Heden's turn, Hodapp followed him into a

bedroom. When Hodapp and Heden were alone in the bedroom, Hodapp began to ask Heden some questions. Heden was not physically restrained. Hodapp also recorded this conversation, but this time the audio recorder was hidden in a pocket of Hodapp's notebook and Heden was probably unaware that he was being recorded.

Hodapp asked Heden about some discrepancies between his earlier statement and other evidence, and after a number of other questions, asked Heden if he had done something to Rose to stop her from crying. Heden responded, "Yeah, I guess I ain't sure if I did shake her a little bit." Hodapp then encouraged Heden to tell the truth. Heden stated that he was "a little antsy" because he did not want to go to prison. Hodapp informed Heden that he could make him no promises in that respect. Heden then admitted to shaking Rose back and forth "too hard." Hodapp asked Heden to demonstrate how he had shaken her, and Heden complied by showing Hodapp what he had done. Hodapp asked Heden how many times he had shaken Rose back and forth, and Heden responded that he had shaken her approximately five times. Heden also acknowledged that Rose's head had snapped back and forth when he shook her.

About 15 minutes into the interview, Hodapp told Heden that he was turning on his tape recorder, pretended to activate the recorder, and then asked Heden to repeat what he had told him. At this point, Heden left the bedroom to use the bathroom. When he returned to the bedroom, Heden repeated his admission, after which Hodapp asked questions highlighting Heden's cooperation with the investigation and asked him, "[y]ou're not under arrest, right?" Heden responded, "[y]eah."

Hodapp then informed Heden that he was now the focus of the investigation and told Heden that he needed to advise him of his rights. Heden asked if he was under arrest, and Hodapp responded that he needed to call the county attorney to "see what he wants to do." Hodapp then advised Heden of his *Miranda* rights and asked if he wanted to give a full statement. Heden again acknowledged shaking Rose, and said that an injury to Rose's chin was from putting her on the floor. The interview ended after about 27 minutes, at which point Hodapp asked Heden to remain in the bedroom while Hodapp spoke with deputies and the county attorney. Hodapp left the bedroom and conferred with the deputies who were at the home. Heden was then placed under arrest.

The next day, Dr. Michael McGee performed an autopsy on Rose. McGee concluded that the manner of death was homicide and the cause of death was "craniocerebral injuries due to or associated with shaken infant due to or associated with an assault." McGee found a fresh-appearing abrasion on Rose's chin, a fingernail scratch on Rose's cheek, and fresh-appearing "fingerprint" bruising on Rose's upper chest that he did not believe were CPR injuries. McGee also found a laceration in Rose's vaginal canal. He later testified that the cause of this laceration was penetration by an oversized object with enough force to tear the tissue, which would have caused Rose pain. McGee stated that this injury was both old and new: the original laceration would have occurred a minimum of two to four days before Rose's death, but the injury was re-torn on the day she died and began to bleed again.

Dr. McGee stated that Rose died due to a fresh-appearing subdural hemorrhage. McGee also found bilateral "perioptic hemorrhage"—bleeding "around the outer aspect of the eye or around the optic nerve"—which is associated with shaken

infant syndrome. McGee testified that the fatal head injuries were consistent with having been inflicted between 6:00 a.m. and 6:40 a.m. on March 1, but he could not rule out infliction of the injuries between 5:00 a.m. and 6:40 a.m. McGee also found evidence of a previous, nonfatal shaking incident that occurred approximately 7 to 14 days before Rose's death and a 2- to 4-day-old tear in Rose's mouth caused by direct pressure.

After receiving preliminary autopsy results indicating that Rose had been sexually assaulted, BCA agents interviewed Heden a third time. After receiving a *Miranda* advisory, Heden said that Rose's crying had woken him up on the morning of March 1 and that he tried giving her a bottle and then a pacifier, neither of which calmed her. He then admitted that he had inserted his finger into her vaginal canal up to the second knuckle approximately three times, and that he noticed blood on his finger, which he wiped on his sweatpants. When nothing stopped Rose from crying, Heden said that he lost control and shook her. He then noticed Rose was not breathing and began to administer CPR. Following this third interview, the county attorney charged Heden with second-degree felony murder and first-degree criminal sexual conduct, and a grand jury subsequently indicted Heden for first-degree murder—criminal sexual conduct, first-degree murder—child abuse, and second—degree felony murder.

In a letter Heden wrote to Shawna from jail five days after Rose died, Heden said: "Something mentally had to happen to me that day, hon. I never imagined I'd do such a thing like that, especially when I don't like killing or horror movies." Shawna also testified at trial that Heden told her that he had "snapped" and had "wound up shaking [Rose] and doing the other charge," but that he said he only "stuck his fingers in" Rose once or twice on the day she died.

Over the course of their investigation, the police learned that Rose had been generally healthy and injury-free until the last few weeks of her life—when Shawna went to work and Heden began to care for Rose alone. On December 8, 16, and 19, on routine visits, Rose was found to be in good health by medical professionals. During a December 29 appointment, a nurse observed a bruise around Rose's left eye. When asked about the bruise, Shawna explained that she had been in the hospital for gallbladder surgery on December 26–27, and when she came home Heden had told her that the bruise resulted from Rose rolling over on the bed and hitting the wall. The nurse was skeptical that a four-week-old baby could roll over and that rolling into a wall would cause such a bruise. As a result of the nurse's observations, a child protection social worker visited the Hedens' home on January 7, by which date the bruise around Rose's eye was no longer visible. The social worker noticed nothing out of the ordinary about Rose during that visit and Shawna and Heden reiterated Heden's earlier explanation for the cause of Rose's bruise. On January 12 and February 2, 2004, Rose was evaluated by her pediatrician, who concluded that she was in good health. The pediatrician specifically noted that Rose had no injuries to her genitalia on February 2.

On or about February 13, 15, and 19, Rose was cared for by family friends, who found her to be injury-free, happy, and interactive. A family friend testified that on February 27, Rose looked happy, interacted with her environment, ate appropriately, and the friend noticed no injuries to Rose's genitalia when she changed her diaper. The friend did, however, notice a bruise the size of an egg on the top right

of Rose's forehead. On February 29, the day before Rose's death, another friend of Heden's and the friend's stepdaughter visited the Hedens, and they reported that Rose appeared to be injury-free and behaving normally.

Heden's trial began on March 25, 2005, and lasted seven days. The state's theory of the case was that sometime after Shawna went to work at approximately 5:15 a.m., Heden digitally penetrated Rose, reopening the previous laceration, and then shook her violently five to six times, causing her death. The state called numerous witnesses. The witnesses included the first responders, law enforcement officials, medical professionals who had cared for Rose during her life, the medical examiner, an additional forensic pathologist, a child protection social worker, and several family members and friends. Heden did not testify and presented only one witness, a pediatric forensic pathology consultant, who testified that autopsy results indicated that Rose had no fresh head or genital injuries on the day that she died, and that her death was caused by complications from a previous head injury. The jury found Heden guilty of first-degree murder—criminal sexual conduct, in violation of Minn.Stat. § 609.185(a)(2) (2004); first-degree murder—child abuse, in violation of Minn.Stat. § 609.185(a)(5) (2004); and second-degree felony murder in violation of Minn.Stat. § 609.19, subd. 2(1) (2004). The district court convicted Heden of first-degree murder-criminal sexual conduct and sentenced him to life imprisonment without possibility of release. Heden subsequently filed this direct appeal, raising the following seven issues:

(1) the court erred in denying Heden's motion to suppress his statement to the police;

(2) the evidence was insufficient to support a finding that Heden's digital penetration of the victim was done "with force or violence";

(3) the evidence was insufficient to support a finding that Heden caused the victim's death *while* committing first-degree criminal sexual conduct;

(4) the imposition of a life sentence without the possibility of release for conviction of first-degree murder—criminal sexual conduct violates the Eighth Amendment, equal protection and due process;

(5) the court erred when it instructed the jury that Minn.Stat. § 609.185(a)(5) (2004) requires the state to prove a "past pattern of child abuse" beyond a reasonable doubt but does not require proof beyond a reasonable doubt of each act constituting the pattern;

(6) the evidence was insufficient to support a finding of a "past pattern of child abuse"; and

(7) the court erred in failing to instruct the jury on the definition of "pattern."

## I.

We first address Heden's argument that the district court erred in denying his motion to suppress statements he made to BCA Agent Hodapp on the day of Rose's death. Heden argues that the court erred in failing to exclude certain parts of the interrogation that took place in the bedroom. Specifically, Heden argues that after he admitted shaking Rose "too hard" approximately five times, he was in custody and further statements during this interrogation should have been suppressed.

■■■ *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prohibits the admission in evidence of statements made by a suspect during "custodial interrogation" absent procedural safeguards to protect the suspect's Fifth Amendment rights. *Id.* at 444, 86 S.Ct.

1602. The state appears to concede that the exchange in the bedroom was an "interrogation" for purposes of *Miranda;* therefore, the sole issue is whether the interrogation was "custodial." We make an independent determination about whether a suspect was in custody. *State v. Staats,* 658 N.W.2d 207, 211 (Minn.2003). But with respect to the facts, we review the district court's findings for clear error. *Id.* "We grant 'considerable, but not unlimited, deference to a trial court's fact-specific resolution of such an issue when the proper legal standard is applied.' " *Id.* (quoting *State v. Champion,* 533 N.W.2d 40, 44 (Minn.1995)).

■ The test for determining whether a suspect was in custody is whether a reasonable person in the suspect's situation would have understood that he was in custody. *Staats,* 658 N.W.2d at 211. " 'If a suspect has not yet been arrested, a district court must examine all of the surrounding circumstances and evaluate whether a reasonable person in the suspect's position would have believed he was in custody to the degree associated with arrest.' " *Id.* (quoting *State v. Miller,* 573 N.W.2d 661, 670 (Minn.1998)). "The test is not whether a reasonable person would believe he or she was not free to leave." *Champion,* 533 N.W.2d at 43.

In reviewing the circumstances to determine whether a suspect was in custody, we look to many factors. While no factor alone is determinative, we have noted that the following factors may combine to indicate custody: the police interviewing the suspect at the police station; the police telling the individual that he or she is the prime suspect; the police restraining the suspect's freedom; the suspect making a significantly incriminating statement; the presence of multiple police officers; and a gun pointing at the suspect. *Staats,* 658 N.W.2d at 211. We have also recognized circumstances that may indicate that a suspect is *not* in custody: questioning taking place in the suspect's home; the police expressly informing the suspect that he or she is not under arrest; the suspect leaving the police station at the close of the interview without hindrance; the brevity of questioning; the suspect's freedom to leave at any time; a nonthreatening environment; and the suspect's ability to make phone calls. *Id.* at 212.

■ Here, the factors involved lead to a mixed result. Some factors support a finding that Heden was not in custody. Heden was neither under arrest nor informed that he was the prime suspect during the part of the statement at issue. During the 27–minute interrogation, Heden was unrestrained, was either standing or seated on a bed, and looking down at Hodapp, who was seated in a chair approximately four to five feet away. Although there were other police officers in the house, only Hodapp was in the room during the interrogation. At no point did any officer draw a weapon in Heden's presence.

That Heden made a significantly incriminating statement is a factor that supports a finding that, from that point on, Heden was in custody. But it is not, as Heden argues, dispositive. We have rejected a bright line rule that when a suspect makes a significantly incriminating statement, that statement automatically converts a noncustodial interrogation into a custodial interrogation. *Champion,* 533 N.W.2d at 43. In *Champion,* we concluded that an admission to the police that the suspect had suffocated the murder victim did not automatically convert the interview from noncustodial to custodial. *Id.* at 44.

We note that there are also factors that support neither a finding that Heden was in custody nor a finding that he was not in custody. The interrogation took place in

Heden's home. Although generally an interrogation in the suspect's home supports a noncustodial finding, here Heden's home was a crime scene under investigation. Additionally, although Hodapp confirmed with Heden that he was not under arrest, Hodapp did not do so at the beginning of the interrogation. A statement that the suspect is not under arrest cannot support a finding of noncustody before the statement occurred. Finally, although Heden was arrested shortly after the interrogation, Hodapp apparently needed to consult with sheriff's deputies after the interrogation before he made this decision.

We conclude that while the applicable factors lead to a mixed result, the overall circumstances of the interrogation indicate that the court did not clearly err in finding that a reasonable person in these circumstances would believe he was not in custody to the degree associated with arrest. The court applied the proper legal standard. As previously noted, when the district court applies the proper legal standard, we grant considerable deference to the court's fact-specific resolution. Therefore, we hold that the court did not err in denying Heden's motion to suppress that part of his third interview given before he received the *Miranda* warning.

## II.

■ We next address Heden's assertion that the evidence was insufficient to support a finding either that his digital penetration of three-month-old Rose was done "with force or violence" or that he caused Rose's death *while* committing first-degree criminal sexual conduct. Minnesota Statutes § 609.185(a)(2) (2004) provides that a person who "causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting the person or another," is guilty of first-degree murder.

We first address Heden's "force or violence" argument.[1] Although section 609.185(a)(2) does not expressly define "force or violence," the statutes governing criminal sexual conduct provide a definition of "force." *See* Minn.Stat. § 609.341, subd. 3 (2004). "Force" is defined in part as the infliction, attempted infliction, or threat of infliction of "bodily harm." *Id.* "Bodily harm" is defined in the general definitions to the criminal code as "physical pain or injury, illness, or any impairment of physical condition." Minn.Stat. § 609.02, subd. 7 (2004). We have approved the use of these definitions in interpreting section 609.185(a)(2). *See State v. Gutierrez*, 667 N.W.2d 426, 434 (Minn. 2003). Accordingly, to support a finding that Heden's digital penetration of Rose was done with force or violence, there must be sufficient evidence that the digital penetration inflicted physical pain or injury or an impairment of Rose's physical condition.[2]

1. Heden's counsel conceded at oral argument that the digital penetration of Rose qualified as first- or second-degree criminal sexual conduct.

2. Despite the statutory definitions and our recent holding in *Gutierrez*, Heden argued both in his brief and at oral argument that "with force or violence" requires a separate analysis of "special danger to human life." To support a conviction for *second-degree felony murder* under Minn.Stat. § 609.19, subd.

2(1) (2004), the underlying felony must involve "special danger to human life." *State v. Anderson*, 666 N.W.2d 696, 700–01 (Minn. 2003). But Heden was tried for and convicted of *first-degree murder—criminal sexual conduct*, not *second-degree felony murder*.

The reason there is a "special danger to human life" requirement in the *second-degree felony murder* statute is to prevent inherently nonviolent felonies—such as property crimes—from serving as a predicate offense for felony murder. *See Anderson*, 666 N.W.2d

The state presented evidence of a laceration 1.1 centimeters long and 5 millimeters deep in the lower portion of Rose's vaginal canal, and that the cause of this laceration was penetration by an oversized object with enough force to tear the tissue, which tearing would have caused Rose pain. The state also presented evidence that this laceration was both old and new. The state's evidence showed that the original laceration occurred a minimum of two to four days before Rose's death, but that the injury was re-torn on the date of her death and began to bleed again, which re-injury would have caused Rose pain. The state also presented evidence that Heden admitted to investigators that he digitally penetrated Rose approximately three times up to his second knuckle on the morning of her death, which penetration caused her to bleed. Viewing the evidence in the light most favorable to the verdict, we conclude that a jury could reasonably have found that Heden's digital penetration of Rose's vaginal canal caused pain or injury or the impairment of her physical condition, and therefore was done "with force or violence" in satisfaction of Minn.Stat. § 609.185(a)(2).

We now turn to Heden's assertion that the evidence was insufficient to support a finding that he caused Rose's death *while* committing first-degree criminal sexual conduct with force or violence. The specific question we are faced with here is the meaning of "while" in Minn.Stat. § 609.185(a)(2). Heden argues that Rose's death did not occur "while" he digitally penetrated her because the digital penetration did not cause her death. We conclude that this argument lacks merit.

■ We have held that in order to prove that a defendant caused the death of a human being while committing criminal sexual conduct, "the state must prove that 'the "fatal wound" was inflicted during the same "chain of events" [in which the underlying felony took place] so that the requisite time, distance, and causal relationship between the felony and killing are established.'" *State v. McBride*, 666 N.W.2d 351, 365 (Minn.2003) (alterations in original) (quoting *State v. Russell*, 503 N.W.2d 110, 113 (Minn.1993)). "So long as the underlying felony and the killing are part of one continuous transaction, it is irrelevant whether the felony took place before, after, or during the killing." *State v. Harris*, 589 N.W.2d 782, 792 (Minn. 1999).

From the time Shawna left for work at approximately 5:15 a.m. until 6:40 a.m. when Heden dialed 911, Heden was the only person with access to Rose except for Rose's five-year-old half-sister, who was asleep. Dr. McGee testified that Rose's fatal injuries were consistent with having been inflicted between 6:00 a.m. and 6:40 a.m. By Heden's own statement to Hodapp, he awoke to Rose's crying and tried unsuccessfully to calm her by giving her a bottle and then a pacifier. Heden then digitally penetrated Rose three times "to see if that'd make any difference on her." When nothing stopped Rose from crying, Heden said he lost control and shook her.

Viewing the evidence in the light most favorable to the verdict, we conclude that a jury could reasonably have found that Heden shook Rose to death during the same

at 701 (holding that firearm possession charges cannot serve as a predicate for second-degree felony murder because possession of a firearm is not inherently dangerous); *State v. Back*, 341 N.W.2d 273, 276 (Minn. 1983) (concluding that a property offense can support a second-degree felony murder conviction if it involves special danger to human life). But *Anderson, Back,* and the second-degree felony murder statute they interpret are inapposite here.

"chain of events" as the digital penetration "so that the requisite time, distance, and causal relationship" between the criminal sexual conduct and the killing has been established. *See McBride*, 666 N.W.2d at 365. We therefore conclude that the evidence was sufficient to prove that Heden caused the death of Rose while committing first-degree criminal sexual conduct. Having previously concluded that the evidence was sufficient to support a finding that the digital penetration of Rose was done "with force or violence," we hold that the evidence was sufficient to support Heden's conviction of causing the death of a human being while committing criminal sexual conduct in the first or second degree with force or violence.

### III.

Finally, we are asked to determine whether Heden's sentence is so excessive and disproportionate to the crime that it constitutes cruel or unusual punishment in violation of Article I, Section 5, of the Minnesota Constitution. Heden was sentenced under Minn.Stat. § 609.106, subd. 2(1) (2004), which provides for a mandatory life sentence without the possibility of release for anyone convicted of first-degree murder while committing or attempting to commit criminal sexual conduct in violation of Minn.Stat. § 609.185(a)(2). "Statutes are presumed constitutional, and a person challenging a sentence as cruel or unusual 'bears the "heavy burden" * * * of showing that our culture and laws emphatically and well nigh universally reject' the sentence." *State v. Chambers*, 589 N.W.2d 466, 479–80 (Minn.1999) (alteration in original) (quoting *Harris v. Wright*, 93 F.3d 581, 583 (9th Cir.1996)).

We recently addressed and rejected an identical claim in *Gutierrez*, 667 N.W.2d at 438. Paul Gutierrez, like Heden, was con-

victed of first-degree murder while committing or attempting to commit criminal sexual conduct in the first or second degree. *Id.* at 429. Gutierrez was sentenced to life imprisonment without the possibility of release under Minn.Stat. § 609.106, subd. 2(1). *Id.* at 438. On appeal, Gutierrez claimed that his sentence constituted cruel or unusual punishment in violation of the Minnesota Constitution. *Id.* We rejected Gutierrez's claim. *Id.* Heden, like Gutierrez, fails to show that "our culture and laws emphatically and well nigh universally reject" his sentence. We therefore hold that Heden's sentence of life imprisonment without possibility of release does not constitute cruel or unusual punishment.

Because we have affirmed Heden's conviction of first-degree murder—criminal sexual conduct, we need not address Heden's arguments regarding the jury's finding of guilt on first-degree murder—child abuse.

Affirmed.